Good morning. May it please the court, Chiege Kalua-Kwara for Mr. Emmith Snell. Your Honor, we've raised several issues, but most important is that there was insufficient evidence to convict Mr. Snell of possession with intent to sell or deliver cocaine, which is count 9 in the Bill of Indictment. He had been acquitted of the conspiracy count, which was on count 2. And we think the jury reached the wrong decision when it convicted him of count 9. All the government offered was that Mr. Snell and Mr. Lindsey and Mr. Horton or Mr. Lindsey had been subject to surveillance for involvement in drug activities from 2009 until July 2013. Count 9 arose from an incident that occurred on June 11, 2013. On that particular day, Mr. Lindsey and Mr. Horton had been involved in at least five undercover sales in 2013. One had been dealt with the week prior, and they had set up a deal for nine ounces, couldn't come up with nine ounces of crack cocaine, and came up with four and a half ounces. Allegedly, Mr. Horton was the middleman, arrived at the deal, called Mr. Lindsey. He appeared. Mr. Lindsey, through trial testimony, indicated that he had forgotten the drugs and that he had called my client to bring him the item. Evidence at trial showed that my client appeared at this scene on his motorcycle and at the car in which Mr. Lindsey and Mr. Horton were for about a minute and left. Allegedly, he had brought in the bag containing the four and a half ounces of crack cocaine, and that was the basis for the conviction. There was no, I had objected to the photographs. There were some still shots taken by the undercover officers of my client in the car, but there was no evidence showing that my client brought in any bag or carried any bag when he arrived at the scene, or that he delivered anything to Mr. Lindsey, who gave it to Mr. Horton, who then sold it to the undercover officers who were parked close by. Over objection, the judge allowed the officers to explain who was depicted in the photographs or who did what. Officer Gerald, one of the undercover officers, testified that he saw Mr. Horton put a phone to his ear. He never testified he saw him dial or make any phone calls, so there was, he said, I just saw him put the phone to my ear. Mr. Lindsey said, oh, he had called my client. There were no phone records, no evidence of that. So is it your position it was not your client who came up on the motorcycle with the bag? No, my client came up on the motorcycle. I'm saying there was no evidence that my client brought any contraband to the scene or delivered any contraband that was sold. And Officer Gerald and Horton, they both testified they never saw my client. So what harm did the photographs cause you? It allowed the officer to explain, oh, this is what you can see happening in the car. The pictures were not clear. I think it's something the jury should have been allowed to. But how did it hurt your case? Because the officers were trying to interpret or explain something that wasn't visible from the photographs or from the. . . Couldn't the jury see that for themselves? That's why I say so. And the jury would have seen my argument would have been it's not clear, which was also the same argument I made. You couldn't really see anything that happened in the car. Okay. But I'm saying there was no. . . Aside from that explanation, and Officer Gerald indicated that even though I testified I saw his hand get to the console, it wasn't in the notes that he had prepared contemporaneously with the event. Mr. Lindsay said he gave my client a key to his stash house. Except for that brief entrance at that event, he didn't have any keys, didn't have any contraband. Mr. Lindsay had been under investigation from 2009 to 2013. Except for him appearing at that June 11, 2013 transaction, there was no other evidence of him dealing or having any dealings, even until the time he got arrested in 2014, May of 2014. You mean other than Lindsay's testimony. Lindsay's testimony was that they had frequent drug dealings. Correct. And the jury obviously disbelieved that. That's why he was acquitted of a count to win the indictment. And I'm saying Lindsay was arrested in July 2013. After his arrest, the government executed search warrants, raided all his houses, recovered a lot of other contraband. From July 2013, he started cooperating with the government. An indictment was returned in April 2014. My client was arrested in May. Except for that one incident, there was no other incident or any evidence of my client being involved in any undercover activities, in any drug deal. So we think even if my client appeared on that scene, there was not enough evidence to show, first of all, that he brought any contraband, that he participated. In Lindsay's testimony, Lindsay indicated that my client was not involved in the planning or that he may have forgotten. I think one of the exhibits that was presented at trial, which I also submitted in my joint appendix, was we say that Lindsay made it up. Eleven people were indicted. My client was the only one who went to trial. On the surreptitiously recorded phone call on October 21, 2014, he kept calling my client's girlfriend, saying, you know, let him take a plea. If he pleads guilty, he'll get two to three years. If he goes to trial, he'll get nine years. My client couldn't take a plea because he'd just been paroled from the North Carolina Department of Corrections in November of 2011 for a second-degree murder conviction, which his sentence was life, but he got paroled. So he'd done everything to try and live a good life. So there was no contraband. He was subject to searches. In fact, when he got out of prison, he made sure that cases he had pending in 1994 and 1993, traffic cases, all the other cases, he had a clean slate. His only conviction when he got out from prison was for speeding in 2014. So, and I think that's part of the reason the jury disbelieved Mr. Lindsay, because there was nothing else tying him to it. And even after the arrest, he didn't have any contraband, didn't have anything. Mr. Lindsay had kept calling my client's girlfriend. I said he sounded very agonized on the phone because I believed he was lying. He said, I met with the government on October 21, 2014, with my lawyer, with the agent. I told them Mr. Snell had nothing to do with it, anything to do with it. I put it all on me. He shouldn't even be on the indictment, you know, but take him, tell him to take a plea. You know how the feds work. They only want to give him, you know, two or three years. And his girlfriend said I had nothing to do with it. So part of the discovery issues was he made that statement. He said I went there and I wrote a statement. The government never turned over that to me. Eventually, when I got the recorded phone call, I forwarded it to them that I had a concern about what Mr. Lindsay said and a statement wasn't provided to me. And I led some Brady and Giglio violations. And what the government did, the prosecutor in this case, Ms. Phillips, was she combined the statement from October 21, 2014, with another so-called summary of what was said on October 31, 2014, which I said, why are you giving me two summaries on the same day? It's more likely than not that Mr. Lindsay said what he said on October 21, because he didn't know he was being recorded when he made all these statements that my client had nothing to do with it. And if you throw out Mr. Lindsay's statement, there's nothing else showing that my client knowingly or intentionally participated in any drug deal on June 11, 2014. We don't even know that he brought any contraband to that deal. It's possible that he could have called Mr. Lindsay and came there and then left. He didn't participate in the deals. He didn't share in any proceeds. He left before the things took place. He was seen in Mr. Lindsay's car for barely a minute, according to the officers. So it's speculation, it's guilt by association to say, oh, he brought drugs, he brought this. When I asked on cross-examination if the officer could show me how, if he came on a motorbike, he carried any bag, the judge said, you know, you can call witnesses or have, you know, them testify to that, which I don't think should happen. But I think there was just insufficient evidence for the jury to have convicted him. What is an innocent explanation for what he did? It could have been Mr. Lindsay was my client's landlord. He could have come, brought him rent money, he could have brought him something, and he said even on the October 21st phone call, Mr. Lindsay, from my understanding of the recording, said, you know, it's probably my fault, you know, I may have told him to get a bag. He didn't know what was in there. So even if he came and brought it, there's no evidence that he knew the contents. He said that they were ---- The clear bag, though, wasn't it? No, the clear bag was what was presented in evidence. We don't know how the bag came there, whether it was brought in another bag. One thing we do know is that Mr. Snell was on a motorcycle. There's no evidence that when he got out of the car, he had a bag in his hand. There's no evidence that when he got there, he was looking around as if trying to be careful. So I think all those are circumstances that point more to innocence than to guilt. So even though Mr. Lindsay said all those things, there's really no evidence that he brought it. And while in the car, he sat in there for a minute. It could have been a number of things. We don't even know if it was my client who called Mr. Lindsay because what the officer said was I saw him put a phone to his ear. So there's no evidence he saw him dial to call my client to come. But you argued this before the jury? Yes, Your Honor. Is this a replay of the argument before the jury? Well, I mean, I argued and they acquitted him of count two but not of count nine. So some of the arguments are additional arguments I've made since we appealed it. And one of the cases I cited more in my reply was this court's decision in the case of Daniel Blue where he even had a key to the stash house. There's no evidence except what Mr. Lindsay said, that my client had any keys to any stash house. No contraband, nothing else was recovered from his. I think the entirety of the evidence was just insufficient to convict him. There's no evidence of knowledge or that he distributed anything or delivered anything to Mr. Lindsay. Thank you very much. I guess I still have two more minutes. Thank you. If you wish to use the two more minutes, you're welcome. I'll use it after. I'll add it to my report. Thank you. Mr. Enright. Yes, Your Honor. May it please the Court. Anthony Enright for the United States. I'll start with the issue that defense counsel says is the most important, which is the sufficiency of the evidence. In particular, I'd like to bring the Court's attention to the fact that the evidence that Mr. Snell brought drugs to the drug transaction that occurred in June of 2013 is Mr. Lindsay's direct testimony, based on his personal knowledge, that he called Mr. Snell. It's on page 212, 213 of the joint appendix. He called Mr. Snell when he realized he didn't have the drugs that he had planned to sell to the undercover officer that he had just received a payment for. He called him because he had a key to his stash house, asked Mr. Snell to bring the drugs to him, and Mr. Snell did exactly that, arriving on his motorcycle and handing him the drugs. This Court's precedent is very clear that even the uncorroborated testimony of a co-conspirator can be sufficient to establish guilt. That's up to the jury to weigh that credibility. But here, that testimony was amply corroborated by the two law enforcement officers who testified about their observation of the transaction. They gave Mr. Horton money. Mr. Horton got in Mr. Lindsay's vehicle. Mr. Lindsay then put a phone to his ear. Approximately two minutes later, Mr. Snell arrived on his motorcycle, handed something over to Mr. Lindsay, and Mr. Horton then exited the vehicle, got back into the undercover police car, and handed them a substance that turned out to be crack cocaine. Was the bus made right then? Was the arrest made right then? I don't believe so, Your Honor. I believe arrests were made later. Was Mr. Lindsay searched before the deal was done? I don't believe that Mr. Lindsay was working with law enforcement officers at that time, Your Honor. I believe they were indicted at a later time, and Mr. Lindsay pleaded guilty and agreed to cooperate with us at that time. I'll turn briefly to the discovery allocations here. Your Honor, the reason we provided Mr. Snell's counsel with a summary of our pretrial meetings with Mr. Lindsay, and the reason that that summary did not contain a statement to the effect that Snell had nothing to do with Mr. Lindsay's drug business is because Mr. Lindsay never made that statement. And the reason we know that is because the prosecutor who was present got up and represented as an officer of the court that he never made that statement, and Mr. Lindsay himself testified under oath that he never made that statement. So that's the reason that we didn't produce it, Your Honor. Turning briefly to the observation by Officer Holding of a prior drug transaction where Mr. Snell was present, the United States Attorney's Office learned about that observation the day before trial, and we realized, hey, that's inculpatory evidence, but it's really too late to use this at trial. We haven't given notice of it, so we declined to do so. When it came up during the trial, we asked for a sidebar, let the court know, let defense counsel know that it had happened. Defense did have the opportunity to address it with the officer but chose not to and didn't seek a continuance or anything. It's not something we were obligated to produce because it's not exculpatory evidence. It's not something we intended to use at trial. But in any event, there's no prejudice because defense counsel did have an opportunity to use it and did not. With respect to the evidence of Ms. Scott's prior conviction, that is evidence relevant only to impeach a defense witness. It is, again, not something that is exculpatory. It is not evidence to impeach a government witness. It's not something that we were required to produce under Brady or Giglio. It's not something we were required to produce under Rule 16 because it's not something that would significantly alter the quantum of proof in favor of the defense. And, again, I'd emphasize no prejudice because Ms. Scott really testified about the conspiracy charge. She testified that Mr. Snell had sources of income other than drugs, but she was not present at the transaction of which he was convicted and didn't really offer any testimony relevant to that particular transaction. Additionally, Ms. Scott was Mr. Snell's girlfriend. The evidence of her prior history was equally available to the defense. They could have asked her, like we did, were you previously convicted of an offense? I don't know if the Court has any additional questions. I have a good amount of time left, but if it doesn't, I will yield the balance to the Court. We have no questions. Thank you, Your Honor. It's a pleasure. Counsel, you have some rebuttal time. Yes, sir. With regards to Judge Hendricks' question, Mr. Lindsay was not searched on June 11, 2013, and they were not arrested right after. Mr. Lindsay continued to deal drugs with Mr. Horton and was subsequently arrested in July 2013. I think it was July 13, 2013. His arrest was kept secret so he could continue to work for the government. The government's counselor answered my question because I had forgotten that he was not cooperating with the government at that time, and they wouldn't have any obligation to have searched him prior to that. Okay, right. And then what started with my case was he started working for the government in July 2013. From July 2013 until my client was arrested in May of 2014, there was nothing else dealing with my client and Mr. Lindsay or anything showing he was involved in any of those deals. With regards to the discovery issues, it's just not one issue. One thing the government has never explained. Why would Mr. Lindsay continue to call Ms. Scott and continue to try and send people to Mr. Snell at the jail to try to get him to take a plea? He's saying, I'm worried about him. Why are you worried about him? I say, it's your conscience bothering you because you know he had nothing to do with this. On the October 21, 2014 recorded call, he kept saying he had nothing to do with it. I met with the government. I put it all on me. He didn't know he was being recorded, and that's what makes it critical, that why would he continue to call and say he had nothing to do with it. He made statements. He said that escapaded my client. The government has also not explained why they met with Mr. Lindsay on October 21, 2014. We met with my client at the Gaston County Jail on October 22, 2014 for a reverse proffer. The government didn't say we've met with Mr. Lindsay. He continues to say this. On October 31, 2014, after I had made motions to compel a production of statements, then the government sends me a combined statement of the alleged interviews from October 21, 2014 and October 31, 2014, two days later, to say he made statements that were consistent. But on other occasions, they say we met with this witness. This is what they said on this day. We met with this, which is what they said on this day. And I think I cited in my brief, it's not the first time Ms. Phillips has been accused of misconduct. I cited the case from Kentucky where, because of her actions, somebody sat in prison for an additional one and a half years after she received information that he wasn't involved in the murder conviction that he was serving. In this case, except for what Mr. Lindsay said, there's nothing else showing that my client actually brought contraband to the scene or delivered anything. None of the officers say we saw him hand anything to Mr. Lindsay. There are no fingerprints. There are no DNA. There are no phone records. There was no evidence showing that Mr. Snell's house was searched and they recovered peripherally. There is just absolutely nothing except what Mr. Lindsay says. It's like guilt by association. Lindsay was the one initiating the phone calls to Scott. It's not her calling him. It's Lindsay calling her. It was Lindsay calling Ms. Scott. It was Lindsay sending people to try and visit Mr. Snell at the jail. It was Mr. Lindsay doing all those things. None on the other side. And it was Mr. Lindsay who said, as Ms. Scott stated during her testimony, Mr. Lindsay continued to call and try to pressure her. She felt pressured, and she decided to record the phone call because she didn't know why he continued to call her. And you can see him. He sounded agonized, in my opinion. You know, he had nothing to do with it. I met with them, and I told them, and they know it, they being the prosecutors. And I've told them that he's not even supposed to be on the indictment. He's not supposed to be on the indictment. So we say, except for what he says, there's nothing else tying him. I would assume that Mr. Snell, from when he was found out where he didn't find out there was an arrest warrant, from the transcript from the initial appearance and detention hearing, indicated, oh, we're changing your probation officer. Come in at 3 o'clock. There's no evidence of flight. And he says, okay, instead of me coming in at 3, I might as well come in at 11. And that's when he found out that he was being arrested. The indictment remained unsealed until he came for the detention hearing, I believe it was May 8, 2014. And the court should also consider that when he came in on June 11, 2013, I think if you have contraband or you're doing something, you're probably looking around to see, is anybody watching me? He parked his car near the undercover vehicle and went in there. He could have come for a number of reasons, maybe pay his rent, maybe do anything or say, where are you? He did not even stay there for more than two minutes. According to the government's evidence, the call was made at 1.58. He arrived at 2. He left at 2.01. I think if he had an interest or dealings, he would have said, oh, what's going down? Okay, I'm going to shame the process. I'm going to shame this. None of those obviously did not have a key to the stash house, did not have any. There's just nothing else if you remove Mr. Lindsay's statement. With regards to Martha Scott, I had made a motion to compel, provide NCIC or ruptures of any witness. They said they had complied with their discovery obligations. And then when she testifies, they impeach her. With regards to Officer Holding, I made motions, pretrial motions, give me everything, statements of witnesses, anything. I could have hurt my client's case when I started cross-examining him and say, okay, show me any surveillance or anything else involving Mr. Snell. That's when the government calls for his sidebar and say, oh, we just found this out last night. If you found it out last night, we already had time for docket. We had jury selection and motion hearings, I believe, the previous day. They could have given me the information to say this is what we found out. Whether or not we're going to use it, I think, is information that I need to have, because that would help me tailor my questions. We don't know what damage that had after I asked the questions. The court calls for his sidebar, and then I don't ask the question. He said I should have asked for a recess. Why would I ask for a recess? We're already in the middle of a jury trial. But I think it's information I have to have, and they can decide. I can decide whether I need to use it. But I don't think the government should be making a decision about what I'm entitled to or not entitled to. Thank you very much. Thank you. I see that you're court appointed, and we appreciate the efforts that you've made on behalf of your client. Thank you.
judges: J. Harvie Wilkinson III, William B. Traxler Jr., Bruce H. Hendricks